Ampt, J.
Northside avenue in the city of Cincinnati was laid out along a hillside and extended east and west for a distance of nearly 1400 feet from Whitfield avenue to Morrison avenue. A natural ravine extended north and south along said hillside and crossed said Northside avenue, as dedicated, beginning, some distance north thereof and extending some distance south of the same.
On June 27, 1893, a petition was presented to the board of administration of said city, asking for the improvement of said avenue between said termini by “grading, setting curbs and crossings, llagging and paving gutters, macadamizing the roadway and constructing the necessary culverts, drains and retaining walls.” Said petition was signed by plaintiffs and all the other owners of property abutting on the street.
*50 The proper boards of the city, passed the necessary resolution and ordinance for the making of said improvement in the manner called for in said petition, including the ‘ ‘ necessary culverts, drains and retaining walls.”
On October 17, 1893, a paper was filed with said board of administration, representing that all the property of the signers on said street was worth more than $7.50 per front foot. The signers of this paper represented all the abutting property. No explanation has been offered why this paper was presented to the board, but it was undoubtedly for the reason that the board should be satisfied, beyond any peradventure, that the value of the abutting property under Section 2272, Revised Statutes, was high enough to sustain the assessment that would grow out of the improvement. The board was at least advised by this paper that it had $7.50 per front foot as a margin of cost in the making of an improvement that would satisfy the needs and expectations of the petitioner’s.
The improvement was completed by the latter part of September, 1894, and an assessment of $3.23 per front foot was levied to pay for the same, payable either in cash or in ten annual installments with interest. Plaintiffs paid the first two installments of said assessment.
After the improvement was completed, plaintiffs, who owned all the property on the south side of the street, began to fill on the same to prepare it for market. Earth was taken from some of the high lots on the north side of the street and placed on their low ground, making a fill the toe of which rested against the Bates trunk sewer south of their property and the upper part of which lapped over and upon the sloping fill of the street. This work occupied a year or more of time.
As Northside avenue was along a hillside, the north side of the avenue generally required a cut and the south side a fill in the making of the improvement. The cross-sections, however, show an exception in that part of the street where the ravine crossed the same. At this point and for some distance on either side of the improvement was mostly a fill, the ground being lower than at any other point on the line of the street.
At the end of two years, after the completion of the improvement, the ground or fill settled somewhat, throwing the south *51 curb out of alignment, but there had been no movement or slip of the street. The contractor brought the street and the curbs and gutters up to grade, which he was required to do in order to receive the retained ten per cent, of the contract price. This work was done in September or October, 1896.
On March 5, 1897, occurred quite a heavy rainfall, the effect of which showed itself on the Northside avenue improvement by causing a slide or slip of the street, along those points where there was the greatest fill. The city, to arrest the slide, along in the summer of 1897-, drove piling along the front of the property on the south side of the street for a distance of 400 feet. In the fall or winter of said year it repaired the street by bringing the street up to grade and resetting the curbs and gutters for a distance of 485 feet.
Notwithstanding the piling, the street again, gave way and slipped along the same places as before. Although this condition has existed for years, no effort has been made by the city to restore and maintain the street in a condition that will make the improvement beneficial to the property immediately abuting. The %oater, which was intended to be carried along the street west to Morrison avenue, is gathered for quite a distance along the street on account of its sunken condition and throiun upon plaintiffs’ property. In consequence of this condition of the street no benefit whatever has been conferred upon the property abutting upon this part of the improvement.
At the junction of Northside avenue and Morrison avenue a large gully has been washed out, making it impossible to pass from one street to the other. In the improvement of Northside avenue, no inlet was placed at the junction of these streets, with a sewer pipe to carry the water down to the trunk sewer, several hundred feet south. In consequence of this gully, the water coming down, the south side of Northside avenue has washed the earth frOm' under the gutters and curbs, causing them to give way and settle. This has extended for a distance of nearly a hundred feet, with indications of steadily becoming worse.
In the amendment of their petition, plaintiffs set forth “improper and negligent construction of the street in failing to provide suitable drainage for natural ravines and water-courses and suitable support for the fills made in grading said street.” *52 Also that ‘‘ defendant had notice of such defects and should have known of such defects in the construction of said street prior to and at the time of the making of the same.”
The city contends that as the improvement was made according to the terms of the contract, and as there might be an honest difference of opinion between engineers as to just what or how much provision should be made for drainage in the preparation of the plans and specifications for an improvement of this kind, and there has been no proof of any gross abuse of corporate power in the preparation of the plans and specifications, such as they were, for this particular improvement, that therefore plaintiffs should be required to pay the assessment. It is not contended that there was anything embraced in the contract to be performed that was omitted, or -that the plans and specifications were not carried out in the doing of the work.
We are not prepared to hold that an honest difference of opinion between engineers can be made the basis of a valid assessment, as an equivalent or substitute for the benefit to be conferred. Nor do we think that in order to overthrow an assessment, where no benefit has been conferred whatever by the improvement, it is necessary to go so far as to show a gross abuse of corporate power in the preparation of the plans and specifications. .
Under the decisions the benefit conferred is the basis of the assessment in any case. If an improvement made according to proper plans confers no benefit, or but little benefit, the assessment is either set aside altogether or restricted in amount. Neither should an assessment be sustained if the improvement, because of serious defects in the plans proposed, confers no benefit. There might be just as much honest difference of opinion between experts o.n the question of benefit as on the question of necessary drainage, and if this difference of opinion can sustain an assessment in one case, why not in the other ?
In the case at bar, the property owners by their petition commissioned the city to make the improvement with the ‘1 necessary culverts, drains and retaining walls.” It insisted on and received a petition under Section 2272, Revised Statutes, which should save it harmless from any loss on account of values. It probably insisted on and at least received a paper which fixed *53 a margin up to which it had a right to go in the making of an improvement which should be beneficial to the property owners.
It assumed the performance of this duty for the property owners and should be held to a strict accountability. If it failed in that regard, and a loss results, it should not fall on the owners, who were willing to be assessed up to $7.50 per foot for the right kind of an improvement. In a word, if the city elects to hold the owners to all the obligations they assumed in signing the petition, it should itself be held to all the obligations it assumed in accepting the petition or commission to do the work, including the making of proper plans with proper provision for proper drainage to secure a beneficial improvement.
The plans did not provide for any drainage ivhatever. In that regard they were the same as if the street, to be improved, were on level ground. The testimony is that while the work was in progress, one of the plaintiffs called the attention of the board and its chief engineer to the ravine and the need of a drain pipe and offered a right of way for same 'through his ground on the south side to his own sewer, which connected with the trunk sewer. Nothing was done, however, in the matter of placing a sewer pipe in the bed of the ravine, which was a cut through the rock, and was the lowest point for the water to gather and flow, with two inlets to the same, one in the north gutter, and the other in the south gutter of the street. Had this been done, the street would have stood.
The engineers of thg city, on the other hand, claim that it was the fill of plaintiff, lapping over and upon the sloping fill of the street, that caused the slip. Mr. Burke disputes this, claiming that his fill tended to hold the city’s fill in its place, and that if it pulled the city’s fill down, this would have appeared in cracks on the street, whereas there were no cracks, but folds of the city’s fill over his own, showing that the city’s fill slipped first. It is important to know where the slip first commenced, and whether it was in the line of the ravine, as the weakest spot or place in the entire fill, or whether the entire stretch of 400 feet slipped at one and the same time.
Mr. Burke testified that in a week or two after the slip began on March 5, 1897, he was on the ground, and found that the *54 street had slipped, starting in the line of the ravine, where the slip was worst, and had extended in width about 50 feet on each side of the line of the ravine. The street had slipped, but his own fill had not commenced to slip at all. It seems to us that this settles the question as to whether or not the fill made by the owners was the primary cause of the slipping of the street and that it refutes the theory of the city’s engineers or witnesses in that regard.
We believe that if the city had provided the drainage suggested by Mr. Burke to get rid of water in the fill made at the weakest point in the entire length of the improvement, or had held the sloping fill in its place by a retaining wall, the street would have stood, and the improvement would have been a benefit to the abutting property, as it was originally contemplated to be.
■ As the city had ample authority and means at its command, in the petition and statement of values filed by the owners, we think that its failure to use any effort to secure a stable improvement under the notice brought home to it, and under the peculiar condition of this hillside in respect to ravines and water-courses, whether it be called a gross abuse of corporate power or not, was at least gross negligence in the exercise of the powers it had at hand under all the conditions and circumstances of the case to make -a beneficial improvement.
While generally the acceptance of work by the city can be construed to be a compliance by the contractor with all things required to be done under his contract, yet the principle does not apply here, because the contention reaches back to what is claimed to be an omission or defect in the plans themselves upon which the contract is based.
Neither can it bo claimed that the petitioners have waived the failure to receive benefits under the circuit court’s decision in the Thornton case, because the want of benefit here grows out of default or neglect of the city, which the petitioners are not estopped from asserting as a reason why no benefit was conferred at all upon a part of the property.
It may be claimed that the preparation of plans and specifications for a street improvement is a matter that rests within the sole discretion of the municipal authorities, and the courts have *55 no right to inquire into the exercise of this discretion at all. We do not believe such a principle would hold good in a case where property owners are expected to pay for an improvement and where such payment can be forced only on the theory of benefits conferred, and where as a matter of fact no benefit was conferred at all, and especially when the owners, in commissioning the city to make the improvement, turn over to it the value of their entire property for the purpose of obtaining a beneficial improvement.
In this connection the case of Toledo v. Grasser, in 7 N. P., p. 396, decided by Lucas District Court, is in point. Among the specifications was the following (bottom p. 398) :
“(2). All drainage necessary for the improvement * * * will be made at such points and in the manner directed by the committee on streets or the city engineer.”
Among its findings the court states (p. 399) :
“Sixth. We find there was no suitable or necessary under drainage to this land; to which one of the principal witnesses * * * attributes the failure of the road, thus admitting that it is in fact substantially defective. * * *
“But it is alleged that whatever defects arise from this want of properly prepared roadbed and suitable drainage was a defect in the plan and method of doing'the work adopted by the council, and hence it is not one of the defects which can be complained of. * * *
“But one fact is evident that the necessary drainage was not furnished at all. * * *
“And as to the terms of the contract not having been violated, we think whatever may be the rule as between the city and contractors, it must be held to be a contract to do the necessary drainage, so far as the parties upon this road are concerned. ’ ’
In that case the assessment was held invalid, because the improvement was defective from want of necessary drainage.
The difference between this Toledo case and the case at bar is this: The specifications in the Toledo case did not call for the necessary drainage, which however was not provided; in the ease at bar while the specifications are silent upon the question of drainage, the ordinance passed by council called for the necessary drainage, which also was not provided by the engineer.
Albert T. Brown, for the plaintiffs.
City Solicitor, contra.
Whether the omission of drainage by the engineer occurs in the preparation of the plans here, or in the execution of the work as in the Toledo case, makes no difference, so far as the effect upon the owners is concerned in having an improvement made, which is defective, because of this omission, and which because of this defect has failed to confer any benefit whatever upon the property.
It has been held time and again that the courts may inquire into the existence and amount of benefits conferred for the purpose of determining the extent of the assessment upon the abutting property. Why can not courts go a step further and inquire why or through whose fault an improvement, after being made, has not been beneficial? Or could it not be claimed that inasmuch as the amount of assessment is to be measured by the amount of the benefit conferred, the property holders here make out a prima facie case by proving want of benefits, thus throwing the burden of proof upon the city to show that, notwithstanding the want of benefits, the owners should still be compelled to pay the assessment. But irrespective of the question as to where the burden of proof rests in this case so far as it relates to any default or neglect on the part of the city in planning this particular improvement, we have found the city at fault from the view we have taken of «all the facts and the testimony presented.
We have examined the property in controversy a number of times, and find that the present dimensions of the slip in the neighborhood of the ravine to be about 400 feet and 100 feet at the west end of the improvement, where the curbs and gutters have commenced to give away.
The decree will perpetually enjoin the remaining eight installments of the assessment of this 500 feet, dissolve the injunction as to the assessment in the remaining property, except the penalty on the same included in the amount certified to the county auditor, all of which penalties will be included in the perpetual injunction, at costs of the city.